**FIRST DIVISION**
**BARNES, P. J.,**
**BROWN and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**December 6, 2022**

# In the Court of Appeals of Georgia

A22A1470. METROPOLITAN ATLANTA RAPID TRANSIT AUTHORITY v. BROWN.

BROWN, Judge.

We granted Metropolitan Atlanta Rapid Transit Authority's (MARTA) request for an interlocutory appeal to determine whether the trial court erred in denying MARTA's motion for summary judgment on Norman Brown's negligence claim arising from his fall on a MARTA train as it was departing the Georgia State station. Brown's complaint alleged that MARTA negligently failed to provide sufficient time for him to safely secure himself prior to departure. For the reasons that follow, we reverse the denial of summary judgment.

To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to

the nonmoving party, warrant judgment as a matter of law. A defendant may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a genuine jury issue on at least one essential element of plaintiff's case. A defendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case; instead, the burden on the moving party may be discharged by pointing out by reference to the affidavits, depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case.

(Citation and punctuation omitted.) *MARTA v. Fife*, 220 Ga. App. 298, 298-299 (469 SE2d 420) (1996). Viewing the evidence in favor of Brown, the record shows that on June 28, 2017, at approximately 5:30 to 6:00 p.m., "in the rush hour," Brown boarded a train at the Georgia State station to return home. Brown was using a walker because he could not "stand that good" and had difficulty walking as a result of gout in his leg. Brown recalled that a lot of people were getting on the train, that the train was packed, that he was one of the last people to get on the train, and that he took "one or two steps" when "all of a sudden the train pulled off fast now, I remember falling." Brown remembers hitting the floor but does not remember anything after that because he hit his head. Brown explained that he "had just got[ten] on the train" and was "standing there when [the train] pulled off fast, I fell because I couldn't stand that

2

good. Just like that wheel of the walker just went one way and I went the other way. That's the only thing I remember." He testified that he could not get to a seat because it happened so fast. He was not holding onto a safety strap because "he wasn't that close to it" and had "just barely" come "through the door." According to Brown, he had a concussion from the fall and a knee injury, which required surgery. Brown sued MARTA, asserting claims for negligence and negligence per se under OCGA §§ 46-9-1[1] and 46-9-132.[2]

MARTA's 30 (b) (6) representative testified that the train operator is responsible for determining the exact moment a train departs a station: "Once they pull into a station and passengers either enter the train or exit the train and they safely close the doors and they have a green signal, they're okay to proceed." Once the doors close, the train operator may depart the station right away, but as the representative explained, the operator first has to get down from the operator seat he

---

[1] "Carriers as such are bound to exercise ordinary diligence. Common carriers as such are bound to use extraordinary diligence, and in cases of loss the presumption of law is against them, and no excuse avails them unless the loss was occasioned by the act of God or the public enemies of the state." OCGA § 46-9-1.

[2] "A carrier of passengers must exercise extraordinary diligence to protect the lives and persons of his passengers but is not liable for injuries to them after having used such diligence." OCGA § 46-9-132.

uses to look out the window; close the door and his window; sit down in the train and then he can move the railcar. It is within the discretion of the operator when to take off after the doors close and the time can vary depending on the station, the number of people getting on and off, the weather, the time of day, and which line. The representative further explained that most of the systems are automated, but that sometimes rail control in Chamblee may indicate a yellow or red signal meaning that the train is not cleared to proceed. He also explained acceleration of MARTA trains, testifying that "the way the train pulls off, it pulls off slowly, you know. The speed is not immediate. So it slowly pulls off from the station, and then it goes to a certain amount of speed."

A second MARTA 30 (b) (6) representative testified that it is the train operator's job to make sure that everyone boards the train safely before they close the door: "[T]heir job is to have their head out looking down the platform. Now, each car is 75 feet long, so for six cars [that] is 450 feet. The platform is 600 feet. So they're looking down the platform to make sure that everyone gets on safely before they close the doors." When asked how long is it before the train takes off once the doors close, the representative testified as follows:

4

I don't know the exact time, but typically what happens is that when the operator hits the door close button, there's a chime, an audible chime, that lets everybody know that the doors are about to close. There's also [an] indicator light above each car, above each door, that will flash so that the hearing impaired will know that the doors are about to close. . . . And so once the operator closes the door and hits what he calls an automatic start button, there's a delay. I don't [know] how many seconds that it is, but it's an automatic one. So he hits the start button. Once the doors close, there's a few-second delay, and then the train gradually picks up speed. And I don't know what that speed is, but, you know, it's probably, like, maybe five or ten miles an hour. And it gradually picks up speed, and that is computer-generated — automated.

The representative acknowledged that there are no rules or regulations or systems in place to make sure that riders are "either seated or otherwise holding onto something so they're secure before the train takes off." As the representative explained, the trains are 75 feet per car, so there is no way for the operator to know that everyone is seated, and many times, particularly during rush hour, some people do not sit:

[I]t's understood once you get on a train and the doors are closing, we're about to take off. So there's no notification about everybody being seated because at any given time, probably 20 percent of your people are standing anyway because they're only going one station, and people don't just sit all the time unless they're going a few stations.

5

MARTA's acting chief engineer of reliability and rail car rehabilitation averred in an affidavit in support of MARTA's motion for summary judgment that given the time frame indicated on the MARTA police incident report, "[t]rain consist 104 with cars 157/158 met the parameters for the incident." He found that there were no incident reports or work orders for those cars on June 28, 2017. He further testified that "the train Mr. Brown was on departed from the Georgia State station westbound and no abnormal acceleration was reported leaving the platform from zero speed." He stated that "[t]he maximum acceleration rate achievable on MARTA railcars is 3.2 miles per hour per second +/-5%; MARTA [railcar] acceleration rates are software limited to 3.0 miles per hour per second +/-5%; this rate is within general industry standards." Additionally, all MARTA railcars' jerk limits are programmed to 2.0 miles per hour per second +/-0.2 miles per hour per second. Adjustments are hardcoded at MARTA and only possible using a laptop computer interface with password security by the manufacturer. The jerk limits prevent "excessive acceleration rate changes (i.e., any unusual and unnecessary jerking)." The engineer averred that

> [a]fter a review of all of the foregoing information, transportation report, maintenance records, and the absence of any reports from any train

6

operator or any other complaints from other patrons, other than the Plaintiff, and based upon [his] education, training and experience with MARTA train cars and rail system, the MARTA railcars 157/158, did not operate abnormally or accelerate abnormally or sustain any unusual or unnecessary jerking, on June 28, 2017, at or around the time of the reported incident of 21:00 to 23:30 hours.[3]

Following discovery, MARTA moved for summary judgment, arguing, in relevant part, that (1) as to Brown's negligence claim, there is no record evidence indicating that the sudden movement of the train as it departed the station was unusual and unnecessary at the particular time and place, and (2) Brown's negligence per se claim fails under OCGA § 46-9-1 because this case does not involve a loss of goods and there is no evidence to show that MARTA was negligent such that it violated any statutory duty laid forth in OCGA § 46-9-132. The trial court denied MARTA's motion as to Brown's ordinary negligence claim, concluding that a jury question exists as to whether MARTA had a duty to ensure that Brown "had a sufficient opportunity to secure himself in the train before the train moved." As to

---

[3] Although Brown deposed that the incident occurred at "rush hour," the reported time frame of the incident according to a MARTA police incident report indicates "21:00 and 23:30 hours." According to Brown, he rode the train for several hours "going back and forth" until some people got him off the train and a MARTA bus driver called MARTA police.

Brown's negligence per se claim, the trial court agreed with MARTA that OCGA § 46-9-1 does not apply but reached a different conclusion as to the alleged violation of OCGA § 46-9-132, concluding that a jury question exists as to whether MARTA violated that statute, and denied MARTA's motion on that ground. The trial court subsequently certified its order for immediate review, and this Court granted MARTA's application for interlocutory appeal.

1. In related enumerations of error, MARTA contends that the trial court misapplied the law governing its liability in this case, resulting in its erroneous denial of summary judgment in MARTA's favor. We agree.

In suits alleging negligent operation of a railroad, street car, or bus, it is well established in Georgia that the plaintiff must present evidence showing that the alleged negligent movement of the conveyance was not only (a) sudden and violent, but also (b) that it was unusual and unnecessary at that time and place. See *Central of Ga. R. Co. v. Lippman*, 110 Ga. 665, 668 (36 SE2d 202) (1900) (train); *Crawley v. MARTA*, 147 Ga. App. 293 (248 SE2d 555) (1978) (bus); *Ga. Power Co. v. Watts*, 56 Ga. App. 322, 323-324 (1) (192 SE 493) (1937) (street car) ; *Central of Ga. R. Co. v. Parish*, 17 Ga. App. 689, 690 (1) (1916) (train). Operators have a duty to provide sufficient time to board a train or streetcar. See *Poole v. Ga. R. and B. Co.*, 89 Ga.

8

320 (15 SE 321) (1892); *Columbus R. Co. v. Joyce*, 25 Ga. App. 652, 653 (104 SE 21) (1920) (every streetcar company has a duty to "allow the persons desiring to embark upon said cars or debark from the same a reasonable time in which to get on the car or get off the car; and the question as to what constitutes a reasonable time is always a fact for determination by the jury"). With regard to whether an operator has a duty to ensure that a passenger has a reasonable time to find a seat before departing a station, however, our courts have concluded that such a duty is owed for railroads/freight-trains, but not street cars. See *Macon D. and S. R. Co. v. Moore*, 108 Ga. 84, 88 (33 SE 889) (1899); *Gainesville M. R. Co. v. Jackson*, 1 Ga. App. 632 (57 SE 1007) (1907). Compare *Watts*, 56 Ga. App. at 323. The rationale for this distinction is that "it [is] a matter of universal knowledge that a passenger entering upon a street-car must anticipate the prompt starting of the car just as soon as he has gained a safe entrance." *Joyce*, 25 Ga. App. at 656 (Jenkins, J., dissenting); *Watts*, 56 Ga. App. at 324 (1) (adopting Judge Jenkins' dissent in *Joyce*). See also *Martin v. Ga. Power Co.*, 45 Ga. App. 799 (165 SE 880) (1932) (noting that it "is well known [that street car] stops and starts must be most frequent and brief in order to at all subserve the use intended by the service").

9

As there has not yet been a case applying these standards to the alleged negligent operation of MARTA trains, we do so for the first time here and find that because a MARTA train is akin to a street car, MARTA had no duty to give passengers a reasonable time to find a seat before departing the station. As Judge Jenkins explained in his dissent in *Joyce*, requiring a street-car operator to hold its cars stationary until each and every passenger has reached a seat or "place for standing" inside the car "imposes a totally impracticable burden, and, as a matter of general and common knowledge, would have the effect of paralyzing the practical and efficient operation of every street car." *Joyce*, 25 Ga. App. at 655 (Jenkins, J., dissenting).

Accordingly, the trial court erroneously concluded "that a jury question exists regarding whether [MARTA] had a duty to ensure that Plaintiff had a sufficient opportunity to secure himself in the train before the train moved." The proper question is whether Brown demonstrated genuine issues of material fact with regard to whether the acceleration of the MARTA train was (a) sudden and violent, as well as, (b) unusual and unnecessary at that time and place. As MARTA presented evidence, through the affidavit of its acting chief engineer of reliability and rail car rehabilitation, that the train on which Brown was riding did not accelerate abnormally

10

or in an unnecessary way, and Brown has presented no evidence to the contrary, the trial court erred by denying MARTA's motion for summary judgment on Brown's negligence claim. See *Watts*, 56 Ga. App. at 323 (1) (reversing judgment in favor of plaintiff against street car company where defendant introduced uncontradicted evidence "to the effect that there was no sudden, unusual, or unnecessary jerk" of the street car). Compare *Kirkland v. Seaboard C. L. R. Co.*, 230 Ga. 108, 110 (196 SE2d 11) (1973) (finding plaintiff's testimony that, while he had been jerked by railroad train many times, he had never before been thrown to floor sufficient to show that sudden stop was unusual).

2. MARTA contends that the trial court erred in denying summary judgment on Brown's negligence per se claim because there is no evidence that MARTA violated its statutory duty under OCGA § 46-9-132.[4] Brown contends that MARTA violated its duty by having no policy as to how much time it should wait between

---

[4] To the extent Brown takes issue with the admissibility of the affidavit of MARTA's chief engineer in response to this enumeration of error, Brown has waived this argument. See *All American Quality Foods v. Smith*, 340 Ga. App. 393, 394, n.1 (797 SE2d 259) (2017) ("[o]bjections to affidavits . . . will not be entertained for the first time on appeal where such affidavits were considered by the trial judge, without objection, in ruling on motions for summary judgment") (citation and punctuation omitted).

closing the doors and the train beginning to move. He also points to evidence that the train operator decides when to start moving. Again, we agree with MARTA.

"[A] common carrier of passengers is not an absolute and unqualified insurer of the safety of its passengers." *Mattox v. MARTA*, 200 Ga. App. 697 (1) (409 SE2d 267) (1991). Rather, "[a] carrier of passengers must exercise extraordinary diligence to protect the lives and persons of his passengers but is not liable for injuries to them after having used such diligence." OCGA § 46-9-132. See also *Walker v. MARTA*, 226 Ga. App. 793, 795 (1) (487 SE2d 498) (1997). Extraordinary diligence is defined as "that extreme care and caution which very prudent and thoughtful persons exercise under the same or similar circumstances." OCGA § 51-1-3. See also *MARTA v. Rouse*, 279 Ga. 311 (1) (612 SE2d 308) (2005).

It is well established that "the occurrence of an unfortunate event is not sufficient to authorize an inference of negligence." (Citation and punctuation omitted.) *Robertson v. MARTA*, 199 Ga. App. 681, 682 (405 SE2d 745) (1991). As MARTA points out in its brief, Brown has no evidence to support that MARTA breached its duty other than his opinion — based on pure conjecture and speculation — that the train took off quickly and he fell, but this is not enough to prove that MARTA violated its statutory duty. See *Brown v. DeKalb County*, 333 Ga. App. 441,

12

444 (777 SE2d 23) (2015) ("[l]ay opinion lacking a proper foundation cannot be considered when ruling upon a summary judgment motion"). Pointing to a lack of a policy as to how much time MARTA train operators should wait between closing the doors and the train beginning to move or time of departure being at the discretion of the train operators, without more fails, to demonstrate a violation of OCGA § 46-9-132.

Additionally, as we already pointed out in Division 1 — in a case applying extraordinary diligence — MARTA has no duty to give its passengers a reasonable time to find their seats before departing the station. See *Watts*, 56 Ga. App. at 323-324 (1) (while a railroad is bound not to start until its passengers have a reasonable time to get to their seats, such is not the law with reference to street cars). Accordingly, the trial court erred in denying summary judgment to MARTA on Brown's claim for negligence per se under OCGA § 46-9-132.

*Judgment reversed. Barnes, P. J., and Hodges, J., concur.*